**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CLARENCE ABNEY,** | : | |
| **Plaintiff** | : | **No. 1:13-cv-1418** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| **CALEB YOUNKER, <u>et al.</u>,** | : | **(Magistrate Judge Carlson)** |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

### I.    INTRODUCTION

This action was initiated by Plaintiff Clarence Abney on May 24, 2013, through the filing

of a nine-count complaint alleging several federal civil rights claims under 42 U.S.C. § 1983,

and several pendent state claims against 17 named Defendants[1] stemming from a June 29, 2012

incident at the State Correctional Institution at Huntingdon ("SCI-Huntingdon"), in which he

was purportedly assaulted by corrections officers.  (Doc. No. 1.)  Counts 1-6 of the complaint

assert the following Eighth Amendment claims: excessive force (Count 1);  failure to intervene

(Count 2);  deliberate indifference to serious medical need (Count 3);  excessive force arising out

of the use of restraints while Plaintiff was unconscious (Count 4);  failure to train and supervise

(Count 5); and failure to screen and train (asserted against John Doe Defendants) (Count 6).

(<u>Id.</u>)  Abney seeks compensatory and punitive damages as well as declaratory and injunctive

relief.  (<u>Id.</u>)  Presently before the Court for resolution is the issue of whether Defendants have

---

[1] Plaintiff's complaint names Sergeant Caleb Younker, Corrections Officer ("C.O.")
Robert Brooks, Sergeant Nathan Lehman, C.O. Richard Snyder, C.O. Justin Hills, C.O. D.
Hartman, C.O. William Mallery, C.O. Marie Everly, C.O. Waylon Yarnell, Sergeant Christopher
Bumbarger, C.O. James Booker, C.O. Matthew Huber, C.O. Rex Wertz, Lieutenant S. Harker,
Lieutenant M. Maxwell, Captain Stevens, Tabb Bickell, and John or Jane Does #1-3 as
Defendants.

met their burden of establishing the affirmative defense of Plaintiff's failure to exhaust administrative remedies with regard to Counts 1, 2, and 4 of his complaint. For the reasons discussed below, the Court finds that Defendants have failed to meet their burden of demonstrating Plaintiff's failure to exhaust administrative remedies with respect to Counts 1, 2, and 4 of his complaint.

## II.      BACKGROUND AND PROCEDURAL HISTORY

The Court, in undertaking an exhaustive review of the complicated procedural history of this case, recites only those facts relevant to the disposition of the matter before it.   This case was originally referred to Chief Magistrate Judge Schwab for pretrial management.  After the filing of an initial partial motion to dismiss by all named Defendants except Defendant Lehman (who answered the complaint), Chief Magistrate Judge Schwab issued a Report and Recommendation, which recommended denial of the motion (Doc. No. 47), a recommendation which was adopted by this Court (Doc. No. 56).  At the request of the parties, Chief Magistrate Judge Schwab bifurcated the case management deadlines as to the proceedings on the issue of exhaustion of administrative remedies from the proceedings on the merits (Doc. No. 25). Subsequently, all Defendants, with the exception of Defendant Lehman (who later made an offer of judgment in the amount of $91,900, which was accepted), filed a motion for partial summary judgment, seeking summary judgment as to Counts 2 through 5 of the complaint, as well as Plaintiff's request for declaratory and injunctive relief, on the basis of failure to exhaust administrative remedies.  (Doc. No. 52.)

In a Report and Recommendation, Chief Magistrate Judge Schwab recommended granting in part and denying in part Defendants' motion for partial summary judgment.  (Doc.

No. 95.)  She found that Defendants failed to satisfy their burden of establishing which version

of DC-ADM 804[2] was in effect and available to Plaintiff at the time of the events at issue;

accordingly, she used the version provided by Plaintiff in her analysis.  (Id.)  In their partial

motion for summary judgment, the Defendants argued that the only grievance received by SCI-

Huntingdon in regard to the incident was submitted in October of 2012 and denied as untimely.

(Id. at 16.)  However, Plaintiff contended that he also filed a grievance relating to the incident on

July 2, 2012.  (Id. at 16.)  He maintained that while at the State Correctional Institution at

Smithfield ("SCI-Smithfield"), (where he was taken after initial medical treatment for the

incident at SCI-Huntingdon), he filled out a grievance form, put it in an envelope addressed to

Connie Green, the grievance coordinator at SCI-Huntingdon, and placed it in the door of his cell

to be mailed.  (Id. at 17-18.)  In his opposition to Defendants' motion, he also represented that he

witnessed a corrections officer pick up the envelope from his door, but he never received a

response to the grievance.  (Id. at 18.)

Chief Magistrate Judge Schwab recommended granting summary judgment on Counts 3

and 5 of the complaint because she found that even accepting that Plaintiff filed the July 2, 2012

grievance as he described, that grievance failed to mention any claim for denial of medical care

or failure to train and supervise.[3]  (Doc. No. 95 at 19-20.)   As to Counts 2 and 4, Chief

---

[2] The Pennsylvania Department of Corrections ("DOC"), has implemented an official
Inmate Grievance System, which is governed by Administrative Directive 804 ("DC-ADM
804").  DC-ADM 804 refers to both the DOC policy statement and its accompanying procedures
manual.

[3] Plaintiff kept his copy of the grievance, which states:

On 6-29-12 on A-Block[,] I was being pat searched by C.O. Brooks[,]
and Sgt. Younker ask me for my I.D.  So I reached inside my T[-]shirt

Magistrate Judge Schwab found that while Plaintiff did not specifically mention a failure to intervene (Count 2), or the employment of excessive force in the use of restraints and dragging and dropping (Count 4), in his grievance he did complain about the use of force by corrections officers preceding the use of restraints.  (Id. at 21.) Specifically, she found that some Defendants' failure to intervene to stop other Defendants from using excessive force could be seen as part of the use of force about which Plaintiff complained in his grievance. (Id.)  Further, she viewed the use of restraints and dragging and dropping as a continuation of the use of force about which Plaintiff complained in his grievance.  (Id.) In addition, she found that Plaintiff's failure to identify the Defendants in Counts 2 and 4 in the grievance did not amount to a procedural default of Plaintiff's claims against those Defendants because the record supported Plaintiff's contention that he was face-down on the floor and/or unconscious or semi-conscious, and thus, was unable to identify certain Defendants.  (Id. at 21-24.) Given Plaintiff's condition, Chief Magistrate Judge Schwab recommended that the Court deny Defendants' motion for partial summary judgment as to Counts 2 and 4 on the ground that Plaintiff procedurally

---

<div style="margin-left:2em">

to produce my I.D. and put it on the desk.  Sgt. Younker back[ed] away from the I.D. like it had some type of disease.  So I picked up the I.D.[,] and Sgt. Younker stated in a harsh manner and tone[:] put the I.D. back[.] [A]nd I said you don't have to talk to me like that[,] and he stated back I'll talk to you any way I want, and the next thing I know I'm on the floor [and] 6 or 7 C.O.'s [are] smashing me to the floor face down [and] then some unknown C.O. kick[ed] me in the face.  I was taken to the RHU[.] A nurse was there cause my face was swollen and I was bleeding profusely[.] [S]o I had to be flown out to the hopsital[–] to the trauma unit[.] [A]nd I was told that I had a mild concussion.  Another doctor told me that my nose is slightly off center.  I left the hospital and was brought to SCI Smithfield in [the] Medical Dept.
Relief: I'm asking for one hundred thousand dollars $100,000.00.

</div>

(Doc. No. 95 at 17.)

defaulted on the claims asserted against Defendants not specifically named in the grievance. (Id. at 23-24.)

Finally, Chief Magistrate Judge Schwab found that Plaintiff did not fail to administratively exhaust his claims for declaratory or injunctive relief, as DC-ADM 804 requires that "compensation or other legal relief" be requested in an initial grievance, but does not specify that equitable relief, such as declaratory and injunctive relief, be explicitly requested. (Id. at 25-26) Therefore, she found that Plaintiff did not procedurally default his request for those types of relief. (Id. at 26.)

As to Count 1 of Plaintiff's complaint, the main excessive force Count, Chief Magistrate Judge Schwab noted that Defendants did not raise the exhaustion issue as to Count 1 in their motion for partial summary judgment, but left open the possibility that they would seek to pursue the affirmative defense of failure to exhaust that claim at a later time, as they stated that for the purposes of their motion for partial summary judgment only, they "accept that Abney has exhausted his administrative remedies with respect to the use of force incident that occurred on A-Block on June 29, 2012." (Doc. No. 95 at 26-27.)

The Court adopted Chief Magistrate Judge Schwab's Report and Recommendation, granted in part and denied in part Defendants' motion for partial summary judgment, and dismissed Counts 3 and 5 with prejudice (Doc. Nos. 110, 111). Accordingly, following the Court's February 24, 2015 Order, the federal claims asserted in Counts 1, 2, 4, and 6 of Plaintiff's complaint remained. (Doc. No. 111.) Subsequently, Chief Magistrate Judge Schwab issued another Report and Recommendation (Doc. No. 112), on a second motion for partial summary judgment filed by the Defendants on August 27, 2014, which again sought summary

judgment on Counts 2 and 4 of Plaintiff's complaint on the basis of failure to exhaust

administrative remedies (Doc. No. 98).  Ultimately, Chief Magistrate Judge Schwab

recommended that the motion be denied as untimely.  (Doc. No. 112 at 11.)  She pointed out that

an earlier case management order had required completion of discovery on exhaustion issues by

January 31, 2014, and the filing of dispositive motions on exhaustion issues by February 28,

2014.  (Id. at 8-9.)

In her Report and Recommendation, Chief Magistrate Judge Schwab addressed her

previous Report and Recommendation and in particular, her directive that the issue of exhaustion

of administrative remedies be resolved prior to discovery on the merits of Plaintiff's claims.  (Id.

at 8-11.) She stated that she set February 28, 2014 as the deadline for the filing of a dispositive

motion on the issue and noted her expectation that all issues regarding exhaustion would be

raised by that deadline.  (Id. at 8-9.)  However, she acknowledged Third Circuit precedent

holding that failure to raise the affirmative defense of exhaustion in a timely dispositive motion

does not completely waive the defense, but only precludes the moving party from receiving a

summary adjudication of it, citing Drippe v. Gototweski, 434 F. App'x 79 (3d Cir. 2011).

Accordingly, Chief Magistrate Judge Schwab stated that while her previous Report and

Recommendation discussed setting a deadline for Defendants to seek a plenary hearing on any

remaining exhaustion issues, she did not suggest that she would consider further dispositive

motions on the issue of exhaustion.  (Doc. No. 112 at 11.) Rather, she stated that she recognized,

in accordance with the Third Circuit's decision in Small v. Camden County, 728 F.3d 265, 269

(3d Cir. 2013), that there may be genuine issues of disputed fact that would need to be resolved

by the Court regarding exhaustion, and she contemplated setting a deadline for the Defendants to

request a plenary hearing on those issues.  (Id.)

Finally, in dicta, Chief Magistrate Judge Schwab stated, regarding Defendants' efforts to revisit which version of DC-ADM 804 was available to Plaintiff at the time of the incident in question, that even accepting Defendants' conclusions as to the applicable version of the DC-ADM 804 in effect[4] would not change her previous recommendation that the July 2, 2012 grievance filed by Plaintiff (assuming that it was in fact filed by Plaintiff as he described) was comprehensive enough to administratively exhaust the claims asserted in Counts 2 and 4 against all of the Defendants against whom those counts are asserted, given that it is "not practicable to [sic] require an inmate to identify individuals by name . . . if he was unconscious or only semiconscious at certain times during the assault, and thus, he did not know who was involved in the incident in question." (Doc. No. 112 at 16-19.) Chief Magistrate Judge Schwab stated her intention, upon remand from this Court, to "set a deadline for the parties to request a plenary hearing on any issues of fact remaining as to exhaustion."  (Id. at 19-20.)

This Court adopted Chief Magistrate Judge Schwab's Report and Recommendation (Doc. No. 112), on February 24, 2016 (Doc. No. 145).  Before Chief Magistrate Judge Schwab could set a deadline for the parties to request a hearing on any issues of fact pertaining to exhaustion, she recused herself from the case, and it was reassigned (along with Abney v. Basial, 16-cv-350), to Magistrate Judge Carlson. (Doc. Nos. 150, 151.)

On April 29, 2016, Plaintiff filed a Motion for Hearing to Resolve Preliminary Issue of Exhaustion of Administrative Remedies (Doc. No. 162), as well as a Supplemental Joint Case

---

[4] That version provides that "[t]he inmate shall identify individuals directly involved in the events(s)."   (Doc. No. 98-3 at 1.)

Management Plan (Doc. No. 163). Magistrate Judge Carlson set deadlines for the filing of briefs regarding Plaintiff's Motion for Hearing. (Doc. No. 169). The parties filed their briefs (Doc. Nos. 170 and 174), and on September 9, 2016, Magistrate Judge Carlson submitted a Report and Recommendation to the Court (Doc. No. 177), in which he ultimately recommended that the Plaintiff be advised to consider making an election between voluntarily consenting to the jurisdiction of a magistrate judge (as Defendants did), or expressly requesting direct district court review of the fact-bound credibility determination pertaining to the exhaustion issue, as he found that the remaining exhaustion issue largely entailed witness credibility determinations, which he maintained might present special burdens and challenges for the district court upon review of a Report and Recommendation. (Id. at 13-17.) Specifically, Magistrate Judge Carlson highlighted the "basic, fundamental factual dispute between the parties regarding whether Abney, in fact, submitted a grievance to prison staff on July 2, 2012." (Id. at 3.) He described the factual issue as one "which will turn almost exclusively upon questions of witness credibility;" specifically, Plaintiff's credibility. Id.

While the Report and Recommendation was pending, Plaintiff withdrew his motion for hearing "in the hope of avoiding further delay in the resolution of this matter." (Doc. No. 178.) This Court then declined to adopt the pending Report and Recommendation as it was moot, and directed the parties to file a joint status report by February 10, 2017. (Doc. No. 179.) The parties, being unable to agree on a joint status report, each filed their own. (Doc. Nos. 181, 182.) In his status report, Plaintiff maintained that because Defendants never requested a hearing on any issues of fact relevant to their affirmative defense of non-exhaustion of administrative remedies, they waived the option of requesting such a hearing, and have therefore waived the

defense as to the remaining federal claims.  (Doc. No. 182.)  In their status report, Defendants

maintained that while they may have waived the ability to receive a summary adjudication on

this affirmative defense, their position was that they were still free to present it at trial, and

indicated that they contemplated a bifurcated trial, with a bench trial on exhaustion followed by a

jury trial on the merits, if necessary.  (Doc. No. 181.)  This approach articulated by Defendants

appears to be directly contrary to the parties' previous request for bifurcation of these

proceedings (Doc. No. 25), which led to Chief Magistrate Judge Schwab's establishment of case

management deadlines applicable to litigation of the issue of exhaustion of administrative

remedies, with discovery related to the merits of the case to follow (id.).

Thereafter, on June 27, 2017, this Court issued an Order scheduling an evidentiary

hearing/oral argument on all outstanding exhaustion of administrative remedies issues for

August 1, 2017.  (Doc. No. 185.)  In that Order, the Court directed the parties to file proposed

findings of fact and conclusions of law in advance of the hearing, which they subsequently did.

(Doc. Nos. 186, 189.)   The Court's review of those filings indicates that Plaintiff seeks a finding

from this Court that he exhausted available administrative remedies as to the remaining federal

Counts of the complaint, which are Counts 1, 2, and 4,[5] while Defendants seek a finding from

this Court that Plaintiff failed to exhaust his administrative remedies as to his claim for

declaratory and injunctive relief, as well as his claims for failure to intervene (Count 2),

deliberate indifference to serious medical need (Count 3), the use of restraints/dragging Plaintiff

(Count 4), and failure to train and supervise (Count 5).  However, as noted above, an earlier

_____

[5] Count 6 of the complaint, as noted above, is a failure to screen and train claim asserted
against John Doe Defendants.  The parties appear to be proceeding as if that count will not be
pursued.

Memorandum and Order of this Court adopted Chief Magistrate Judge Schwab's recommendation to dismiss Counts 3 and 5 from this case with prejudice, and affirmed Chief Magistrate Judge Schwab's conclusion that the terms of the DC-ADM 804 and its directive that inmates request "compensatory or other legal relief" did not put Plaintiff on notice that he needed to request declaratory or injunctive relief (or, in other words, equitable relief), as well, so Plaintiff did not fail to exhaust his administrative remedies as to those claims. (Doc. Nos. 95, 110, 111.) In their pre-hearing Proposed Findings of Fact and Conclusions of Law, Defendants' position on exhaustion of administrative remedies with regard to Count 1 remained unclear. However, at the hearing, statements made by Defendants' counsel clarified Defendants' position that Plaintiff did not file a grievance on July 2, 2012 as he maintains, but instead fabricated the July 2, 2012 grievance after the fact once his later-filed grievance was deemed untimely, and therefore, failed to exhaust administrative remedies as to Count 1 as well. (Doc. No. 198, Tr. at 5: 25-6:2.)

Accordingly, in light of the rulings the Court has already issued in this case, and the representations of the parties, the Court understands Defendants' position to be that Plaintiff failed to exhaust administrative remedies with regard to the remaining federal claims in this case, namely, Counts 1, 2, and 4. Consequently, the issue for resolution by the Court is a determination as to whether Defendants have met their burden to demonstrate the affirmative defense of Plaintiff's failure to exhaust administrative remedies as to Counts 1, 2, and 4 of his complaint.

III.    APPLICABLE LEGAL STANDARD

The Prison Litigation Reform Act ("PLRA"), requires a prisoner to exhaust available

administrative remedies prior to filing a federal action challenging prison conditions, providing,

in relevant part,

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

In an earlier Report and Recommendation adopted by this Court, Chief Magistrate Judge

Schwab set forth the legal standards governing the requirement that a prisoner exhaust

administrative remedies, as follows:

> "Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court." Jones v. Bock, 549 U.S. 199, 204 (2007). "This has the potential to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record." Id. Thus, the benefits of the exhaustion requirement "include allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." Id. at 219. While the exhaustion requirement serves to alert prison officials to a problem, "notice to those who might later be sued . . . has not been thought to be one of the leading purposes of the exhaustion requirement." Id.
>
> In accordance with § 1997e(a), the exhaustion of available administrative remedies is mandatory, Booth v. Churner, 532 U.S. 731, 739 (2001), and the "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002). A prisoner must "exhaust all available administrative remedies" regardless of whether the administrative process may provide the prisoner with the relief that he is seeking. Nyhuis v. Reno, 204 F.3d 65, 75 (3d Cir. 2000). "[C]ompliance with the administrative remedy scheme will be satisfactory if it is substantial." Id. at 77. Failure to exhaust available administrative remedies is an affirmative defense. Jones v. Bock, 549 U.S. 199, 216 (2007). As such, the defendant has the burden of pleading and proving that the prisoner failed to exhaust administrative remedies. Brown v. Croak, 312 F.3d 109, 111 (3d Cir. 2002).

> 42 U.S.C. § 1997e(a) requires proper exhaustion. <u>Woodford v. Ngo</u>, 548 U.S. 81 (2006). In other words, it requires more than simple exhaustion, <u>i.e.</u>, more than that there is no further process available to the prisoner within the grievance system. <u>Spruill v. Gillis</u>, 372 F.3d 218, 227-31 (3d Cir. 2004). Section 1997e(a) requires that a prisoner follow the procedural requirements set forth in the administrative remedy process that is available to him. <u>Id.</u> at 231. The prison grievance procedures supply the yardstick for measuring whether exhaustion was proper. <u>Id.</u> <u>See also</u> <u>Jones</u>, 549 U.S. at 218 ("The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.").

(Doc. No. 95 at 10-11.)

The Supreme Court fairly recently reiterated the mandatory nature of Section 1997e(a), which it confirmed is subject only to the limitation "baked into its text: An inmate need exhaust only such administrative remedies as are 'available.'" <u>Ross v. Blake</u>, 136 S. Ct. 1850, 1862 (2016) (quoting 42 U.S.C. § 1997e(a)). Accordingly, the exhaustion requirement "hinges on the 'availab[ility]' of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." <u>Id.</u> at 1858. The Court explained that "the ordinary meaning of the word 'available' is 'capable of use for the accomplishment of a purpose,' and that which 'is accessible or may be obtained.'" <u>Id.</u> at 1858-59 (quoting <u>Booth</u>, 532 U.S. at 737-738 (internal citations and quotation marks omitted)).

The Court then continued to describe "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." <u>Id.</u> at 1859. First, the Court noted that "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates." <u>Id.</u> Second, the Court imagined an administrative scheme that "might be so opaque that it becomes,

practically speaking, incapable of use.  In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it."  Id.  The Court explained that if an administrative process is "susceptible of multiple reasonable interpretations, Congress has determined that the inmate should err on the side of exhaustion;" however, if a remedy is "essentially 'unknowable' – so that no ordinary prisoner can make sense of what it demands – then it is also unavailable."  Id.  The third situation arises "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."  Id. at 1860.  The Court noted that "such interference with an inmate's pursuit of relief renders the administrative process unavailable."  Id.

Exhaustion is a precondition to a Section 1983 suit, constituting a "'threshold issue that courts must address to determine whether litigation is being conducted in the right forum at the right time.'"  Small, 728 F.3d at 270 (emphasis in original) (quoting Dillon v. Rogers, 596 F.3d 260, 272 (5th Cir. 2010)).  Further, "exhaustion is a question of law to be determined by a judge, even if that determination requires the resolution of disputed facts."  Id. at 269.

IV.     HEARING

The Court briefly summarizes the relevant testimony and evidence offered at the hearing.

A.      Keri Moore

Defendants first offered the testimony of Keri Moore, the current acting chief grievance officer at the central office of the Pennsylvania Department of Corrections.  Ms. Moore described DC-ADM 804 as a DOC policy indicating how an inmate can submit a complaint or grievance regarding an issue that occurs during their incarceration.  (Doc. No. 198, Tr. at 8:24-

9:1.)  She offered testimony regarding Defendants' Exhibit 1,[6] which is the version of the DC-ADM 804 that went into effect on December 8, 2010.  (Id., Tr. at 9:17-22.)  She testified that Section 1 of the DC-ADM 804 procedures manual, pertaining to Grievance and Initial Review, was revised on December 28, 2011, and further, that this version of the policy was the one in effect in 2012 on the date of Plaintiff's assault.  (Id., Tr. at 9:23-10:7.)  As to the contents of a grievance submitted under DC-ADM 804, she testified that an inmate is required to give a brief summary of his or her concerns and details regarding the particular event that led to the grievance – when, where, who was involved, etc. (Id., Tr. at 10:8-15.)

She described the stages of the grievance process contemplated by DC-ADM 804 as consisting of an initial 15-day period for the filing of a grievance after the occurrence of an incident the inmate seeks to grieve.  (Id., Tr. at 10:24-11:19.)  Once a grievance is filed, it is assigned to a grievance officer for an initial review response to that inmate, and if the inmate is dissatisfied with that response, he has 15 days within which to appeal it to the facility manager at the institution where the incident occurred.  (Id., Tr. at 10:25-11:6.)   An inmate who is dissatisfied with the response of the facility manager can appeal it to final review at the Secretary's Office of Inmate Grievances and Appeals ("SOIGA"), within 15 days of the facility manager's response.  (Id., Tr. at 11:6-8.)  Ms. Moore clarified that an inmate must receive a response to a grievance before appealing it to the next level of review.  (Id., Tr. at 17:5-8.)  She testified that DC-ADM 804 addresses the situation where a prisoner is moved to another facility within the initial 15 working days after an incident that he seeks to grieve, providing that "[a] grievance must be filed with the facility grievance coordinator at the facility where the grievance

---

[6] Defendants' Exhibit 1 was admitted into evidence.

event occurred." (Id., Tr. at 11:20-12:6.) She testified that the provision meant that in order to submit a grievance to a facility where an inmate is no longer located, that inmate would have to mail the grievance to the facility where the incident occurred. (Id., Tr. at 12:10-13.) With regard to the assault of Plaintiff that occurred on June 29, 2012 at SCI-Huntingdon, Ms. Moore testified that Plaintiff did not appeal any grievance regarding the incident to final review at SOIGA. (Id., Tr. at 12:14-20.)

Ms. Moore also offered testimony regarding DC-ADM 001, Defendants' Exhibit 7, admitted into evidence. She testified that DC-ADM 001 governs Inmate Abuse Allegation Monitoring, and provides for procedures to track and monitor allegations of staff abuse by inmates. (Id., Tr. at 13:8-17.) She testified that no remedies are available to inmates under the policy. (Id., Tr. at 13:18-20.) She also testified that the policy provides that an inmate who is the victim of abuse should file a grievance in accordance with DC-ADM 804. (Id., Tr. at 13:24-14:11.) She offered testimony regarding Section 1.B.2 of the policy regarding reporting allegations of abuse, which has an effective date of July 27, 2012. That section provides:

> A grievance dealing with allegations of abuse shall be handled in accordance with Department policy DC-ADM 001, "Inmate Abuse Allegation Monitoring Process" and/or DC-ADM 008, "Sexual Harassment of or Sexual Contact with Inmates." This may extend the time for responding to the grievance, but will not alter the inmate's ability to appeal upon his/her receipt of the Initial Review Response. When a grievance is related to an allegation and the grievance is the first notice made by the inmate, the Grievance Coordinator will issue an Extension Notice to the inmate by checking the box "Notice of Investigation." The Initial Review Response will be completed by the assigned Grievance Officer when the results from the Officer of Special Investigations and Intelligence are received. If the grievance is not in compliance with DC-ADM 804, the rejected grievance will be forwarded to the facility security office so an investigation can be initiated. (Def. Exh. 7, Doc. No. 188-2 at 7.)

Upon cross-examination, Ms. Moore testified that typically inmates are notified of

changes to the DC-ADM 804, but she could not state for sure whether Plaintiff was informed of any changes to Defendants' Exhibit 1, the version of DC-ADM 804 with an effective date of December 2010. (Id., Tr. at 17:12-21:24.) Upon questioning, Ms. Moore also offered testimony about DC-ADM 804's provisions regarding lockboxes at Section 1.B.14. She testified that DC-ADM 804 provides that each facility should ensure that a lock-box designated for inmate grievance forms is installed in all Level 5 housing units and inmate dining halls. (Id., Tr. at 22:7-12.) Specifically, she testified that DC-ADM 804 provides that "[t]he lock-box on the L5 housing unit shall be placed in a location easily accessible to an inmate being escorted to an individual exercise unit. The inmate will be permitted to place [the grievance] in this lock-box. If an inmate chooses not to go to an individual exercise unit, he/she may have a staff member place the item in the lock-box." (Def. Exh. 1 at 1-5.)

B.    Clarence Abney

Defendants next called Plaintiff to testify, and he described his involvement in an altercation with corrections officers at SCI-Huntingdon on June 29, 2012, after which he was transferred to Altoona Regional Hospital for treatment. (Doc. No. 198, Tr. at 25:21-23.) He testified that the following day, June 30, 2012, he was sent to SCI-Smithfield and placed in a psychiatric observation cell ("POC"). (Id., Tr. at 25:24-26:5.) Initially, he believed he was in the infirmary because of the presence of nurses, but later realized that it was a POC. (Id., Tr. at 26:6-11.) He testified that when he arrived at the POC, he was given a pen and envelopes, and that he then requested a grievance form from a corrections officer, who provided it to him. (Id., Tr. at 26:12-14; Tr. at 28:3-11.)

Plaintiff testified regarding Defendants' Exhibit 2 (subsequently admitted into evidence),

which is a grievance form regarding the June 29, 2012 incident dated July 2, 2012. (Id., Tr. at 19:9-24.) Plaintiff testified that he filled the form out on July 2, 2012, put it in an envelope addressed to Connie Green, the grievance coordinator at SCI-Huntingdon, and put it in the door of his cell to be placed in the mail. (Id., Tr. at 29:23-30:9.) He further testified that he saw a corrections officer pick up the envelope the same day and carry it out of the unit along with other mail. (Id., Tr. at 30:10-15.) As to the grievance form itself, the parties stipulated that it only includes the names of two corrections officers, C.O. Brooks and Sergeant Younker. (Id., Tr. at 31:5-16.) Plaintiff testified that he never received a response to the July 2, 2012 grievance. (Id., Tr. at 31:22-24.) Plaintiff testified that he submitted another grievance regarding the June 29, 2012 incident on October 12, 2012, but that grievance, Grievance Number 432176, was rejected on October 16, 2012 as untimely. (Id., Tr. at 31:25-33:8.) He testified that he appealed that rejection to the facility manager, Mr. Tabb Bickell, on December 14, 2012; however, it was denied on December 31, 2012. (Id., Tr. at 33:9-22.) Plaintiff's October 12, 2012 grievance, its rejection, his appeal of that rejection, and its denial were admitted into evidence as Defendants' Exhibit 3. Plaintiff testified that he was unsure whether or not he appealed that denial to the SOIGA office. (Id., Tr. at 33:23-34:3.)

Defendants' counsel questioned Plaintiff about the explanation he provided in his October 12, 2012 grievance regarding the reason for the tardiness of the grievance: "because I was moved and I didn't know that I could send the grievance back to SCI-Huntingdon." (Def. Exh. 3 at 2.) Upon questioning, Plaintiff confirmed that on September 30, 2012, he asked Rebecca Mitchell from the Pennsylvania Prison Society whether or not he could file a grievance related to the June 29, 2012 incident. (Doc. No. 198, Tr. at 34:22-25.) Plaintiff also confirmed

that the first written record of his mention of a prior grievance was in a letter he sent to Ms. Mitchell in November of 2012.  (Id., Tr. at 35:1-8.)

Plaintiff's counsel cross-examined him regarding his knowledge of what the DC-ADM 804 or relevant inmate handbook provided regarding the situation where an inmate is located at a different institution from the one where an incident subject to grievance occurred.  Plaintiff stated his understanding that what he should have done is what he did - filled out a grievance form, addressed it to the grievance coordinator from the other institution, and put it for mailing. (Id., Tr. at 41:2-10.)   Given the lack of response to the grievance, Plaintiff stated that he was unsure whether the SCI-Huntingdon grievance coordinator received the grievance.  (Id., Tr. at 41:11-15.)  He testified that his question to Ms. Mitchell was in regard to the lack of response to the grievance.  (Id., Tr. at 41: 16-18.)

C.    Connie Green

Defendants' next offered the testimony of Connie Green, the Superintendent's Assistant at SCI-Huntingdon (since 2007) whose duties included acting as the grievance coordinator at SCI-Huntingdon. (Id., Tr. at 43:11-25.)  She explained that her duties as grievance coordinator include picking up grievances in the designated grievance boxes, receiving them through the mail, and then reviewing each grievance to determine if it is filed in accordance with DC-ADM 804.  (Id., Tr. at 44:6-17.)  She testified that if the grievance is filed in accordance with DC-ADM 804, she assigns it to a grievance officer for investigation; if it is not filed in accordance with DC-ADM 804, she rejects the grievance and returns it to the inmate with a note explaining the basis for the rejection.  (Id., Tr. at 44:12-17.)  She testified that in her years as grievance coordinator at SCI-Huntingdon, she never ignored a grievance or destroyed a grievance, nor was

she aware of anyone on the SCI-Huntingdon staff doing those things during her ten year tenure as grievance coordinator. (Id., Tr. at 44:18-45:4.)

She also offered testimony regarding another one of her duties, acting as policy coordinator at SCI-Huntingdon. In that capacity, she receives email notification of any updated DOC policy or new DOC policy and is responsible for forwarding those emails to the SCI-Huntingdon staff. (Id., Tr. at 45:8-19.) Further, she testified that if there is a revision to the DC-ADM 804, inmates would be affected by the change, so she is responsible for notifying them of any changes. (Id., Tr. at 45:19-21.) She testified that the central office puts together a memorandum outlining the changes, and then each institution is responsible for copying and distributing the memorandum to the inmates. (Id., Tr. at 45:22-46:2.) This would typically be done by the shift supervisor on the second shift, who would distribute the memorandum to the inmates, and sign an acknowledgment that the relevant policy change was distributed to every inmate. (Id., Tr. at 46:2-7.) Ms. Green also testified that an updated copy of DC-ADM 804 is kept on each unit, as well as in the library, for inmates to borrow. (Id., Tr. at 46:11-19.) She testified that SCI-Huntingdon tracks the distribution of updated policies, and described the use of Defendants' Exhibit 6, admitted into evidence, which is an example of the type of memoranda used at SCI-Huntingdon to track when each unit at the facility receives notice of policy changes. (Id., Tr. at 46:20-48:13.) She testified that Defendants' Exhibit 6 is representative of what was used by SCI-Huntingdon in December of 2011, and further testified regarding Defendants' Exhibit 5, admitted into evidence, which is the email Ms. Green received in December of 2011 notifying her of DC-ADM 804 policy updates. (Id., Tr. at 48:15-49:22.) She testified that while she did not specifically remember forwarding the December 2011 policy revisions to staff at

SCI-Huntingdon, she believed she did so, given that she has never failed to forward policy revisions in her ten years as policy coordinator. (Id., Tr. at 49:23-50:11.)

With specific regard to Plaintiff, Ms. Green testified that her review of his grievance submissions for 2012 revealed that he did not submit a grievance in July of 2012, only in October of 2012. (Id., Tr. at 50:12-19.) She confirmed that Plaintiff's October 2012 grievance (Defendants' Exhibit 3) regarding the June 29, 2012 incident was rejected as untimely, and that the facility manager upheld the rejection of Plaintiff's October 2012 grievance. (Id., Tr. at 51:2-17.) She also testified that to her knowledge Plaintiff did not appeal the facility manager's upholding of the rejection of his October 2012 grievance to the next level of review at SOIGA. (Id., Tr. at 5:18-20.)

Upon cross-examination, Plaintiff's counsel followed up with Ms. Green about her role as policy coordinator in distributing policy updates to inmates at SCI-Huntingdon. Ms. Green indicated that in 2011, Polly Strieghtiff was responsible for distributing the memoranda to the units, receiving the certifications that the memoranda were distributed to the inmates on each unit, and then reporting back to her that the memoranda were distributed. (Id., Tr. at 53:15-54:3.) Plaintiff's counsel also questioned her regarding the rejection of Plaintiff's October 2012 grievance as untimely, and the denial of Plaintiff's appeal of the rejection. (Id., Tr. at 54:10-17.) She stated that Plaintiff's appeal of the rejection was untimely but was answered by the facility manager despite its untimeliness. (Id., Tr. at 54:16-17.) In response to questioning by Plaintiff's counsel regarding whether the DC-ADM 804 permits some exceptions to the timeliness requirement, Ms. Green pointed to a provision of the DC-ADM 804 that provides as follows:

> An exception to the 15 day filing requirement will be made only when the inmate notifies the Facility Manager/designee of the reason for the delay and it is deter-

mined that the delay in filing was caused by:

(1)     a temporary transfer from the facility where the grievance should have been filed;
(2)     a permanent transfer to another facility from the facility where the grievance should have been filed;
(3)     Authorized Temporary Absence (ATA) for an extended period; or
(4)     another delay with mail delivery.

(Def. Exh. 1 at 2-2.)

Ms. Green stated that the grievance coordinator at SCI-Huntingdon at the time of the filing of Plaintiff's October of 2012 grievance, Andrea Wakefield,[7] did not utilize her discretion to accept Plaintiff's October 2012 grievance despite its tardiness.  (Id., Tr. at 56:9-14.)  Upon questioning by Plaintiff's counsel, Ms. Green testified to her awareness of an investigation that occurred regarding the mishandling of grievances at SCI-Smithfield.   (Id., Tr. at 56:15-18.) She testified that she was questioned regarding whether and what kind of assistance she had given the grievance coordinator at SCI-Smithfield, and had responded that she had not given any. (Id., Tr. at 57:3-11.)

Upon further questioning by the Court, Ms. Green stated that she did not know the outcome of the investigation, other than the fact that SCI-Smithfield Superintendent Fisher resigned.  (Id., Tr. at 57:19-22.)  She also explained one of counsel's references to SCI-Smithfield as the facility next door, stating that the two correctional institutions are located about a half mile away from each other on the same road.  (Id., Tr. at 57:23-58:3.)  She further explained that the two facilities - SCI-Smithfield and SCI-Huntingdon - share a mailroom and the same mail personnel.  (Id., Tr. at 58:4-9.)  She explained that at SCI-Huntingdon, if staff sees

_____

[7] At that time Ms. Green was on sick leave from her duties as grievance coordinator at SCI-Huntingdon.

that an inmate has addressed a piece of mail to SCI-Smithfield, rather than putting it in the United States mail which would result in a postage charge to the inmate, staff would put the mail in a box in the mailroom for distribution at SCI-Smithfield. (Id., Tr. at 58:11-20.) Accordingly, she stated that it was possible that an inmate grievance addressed to SCI-Huntingdon and put in the mail at SCI-Smithfield would never go through the United States mail, but would instead be put in an outbox for delivery to SCI-Huntingdon. (Id., Tr. at 58:21-25.)

Upon further questioning by Plaintiff's counsel, Ms. Green stated that there are family relationships between officers serving at SCI-Smithfield and SCI-Huntingdon; for example, the superintendent of one of the facilities is the sibling of the superintendent's assistant at the other facility. (Id., Tr. at 59:12-17.) Defendants' counsel concluded her presentation of evidence with Ms. Green, and the Court admitted Defendants' exhibits 1, 2, 3, 5, 6, and 7 into evidence, with no objection from Plaintiff's counsel, except to argue that Defendants' Exhibit 1 was not the relevant version of DC-ADM 804 in effect and available to Plaintiff at the time of the June 29, 2012 incident.

D.    Additional Testimony by Clarence Abney

Plaintiff's counsel then conducted a direct examination of Plaintiff, who briefly described the June 29, 2012 assault that is the subject of this litigation. Plaintiff's counsel submitted Plaintiff's Exhibit S, described by Plaintiff's counsel as a video of Plaintiff that followed him from the location of the incident to the strip cell where prison staff began to administer medical treatment to him after the incident, for in camera review by the Court, without objection from

Defendants' counsel.[8]  (Doc. No. 198, Tr. at 61:25-62:4.)  At the hearing, Plaintiff's counsel

described the evidentiary value of the video as demonstrating the condition of Plaintiff, including

his mental state, immediately following the incident.

The Court's in camera review of Exhibit S reveals an approximately thirty-minute long

video which first shows Plaintiff being escorted through the prison to the strip cell, during which

time his hands are restrained behind his back, and he is bent over almost at the waist as he is

moved through the prison, heavily supported on both sides by corrections officers.  At a couple

of points Plaintiff appears to almost fall to the floor, although it is difficult to tell from the video

whether he stumbles or is dropped by prison staff.  After arriving at the strip cell, Plaintiff is

directed to stand with his face against the wall of the cell.  Plaintiff appears to be bleeding

profusely from his face.  At some point medical personnel arrive to attend to him, and he is

ultimately removed from the cell, his restraints adjusted, and is placed on a stretcher.  He is then

taken to another room where his bloody clothing is removed and he is dressed in an orange

jumpsuit.  At some point he begins twitching or shaking, appearing to suffer a seizure or

convulsion, after which he becomes unresponsive.  Ultimately he is removed from the prison for

medical treatment.

Plaintiff's counsel examined Plaintiff with regard to the POC where he was housed at

SCI-Smithfield after returning from the hospital on June 30, 2012.  Plaintiff stated that while in

the POC, he did not have access to a lockbox, nor could he see a lockbox from the POC.[9] (Id.,

---

[8] Counsel agreed to the admissibility of Plaintiff's Exhibit S by post-hearing stipulation.
(Doc. No. 193 at 1.)

[9] In her questioning, Plaintiff's counsel referenced  photographs of the POC  where
Plaintiff was held at SCI-Smithfield.  By post-hearing stipulation of counsel, the parties agreed

Tr. at 65:12-24.)  He also testified that he did not get pain medication while in the POC.  (Id., Tr. at 65:25-66:1.)  Plaintiff testified that he submitted a grievance on July 2, 2012, which counsel marked as Plaintiff's Exhibit Q.[10]  (Id., Tr. at 66:2-3.)  He also testified that he retained the "goldenrod" copy of the July 2, 2012 grievance after submitting it. (Id., Tr. at 67:5-22.)  Plaintiff testified that he never got a response to the grievance he submitted on July 2, 2012.  (Id., Tr. at 70:2-6.)  Plaintiff's counsel then questioned him regarding whether he had a copy of the DC-ADM 804 around the time of the July 2, 2012 grievance.  He stated that he had a copy of the policy.  (Id., Tr. at 70:13-15.)  He testified that he did not get notification of revisions made to the policy in 2010 and 2011.  (Id., Tr. at 71:10-13.)  Plaintiff testified that while he was in the POC at SCI-Smithfield in July of 2012 he did not go out to exercise or to the law library, but certain investigating officers from OSII[11] came to see him in the POC shortly after he arrived there.  (Id., Tr. at 71:14-72:6.)  Counsel next briefly questioned Plaintiff regarding Plaintiff's Exhibits I, D, and P, which she represented to be correspondence regarding Rebecca Mitchell. Only Plaintiff's Exhibit I was admitted into evidence by post-hearing stipulation of counsel. (Doc. No. 193 at 1.)  The contents of Plaintiff's Exhibit I will be discussed below in connection with the Court's summary of the testimony of Rebecca Mitchell.

Plaintiff's testimony concluded with his counsel again showing him a version of the July

_____

to the admissibility of Plaintiff's Exhibit T, which consists of several photographs of the POC and rolling lockboxes utilized at SCI-Smithfield.  (Doc. No. 193 at 1.)

[10] By post-hearing stipulation, counsel agreed to the admissibility of Plaintiff's Exhibit Q. (Doc. No. 193 at 1.)  A copy of the July 2, 2012 grievance was also admitted into evidence as Defendant's Exhibit 2, without objection from Plaintiff.  (Doc. No. 198, Tr. at 60:3-11.)

[11] "OSII" stands for the Office of Special Investigations and Intelligence.  (Doc. No. 188-6, Plaintiff's Exhibit J.)

2, 2012 grievance (seemingly, either Defendants' Exhibit 2 or Plaintiff's Exhibit Q, although not explicitly identified by Plaintiff's counsel), and questioning him regarding it. Plaintiff testified again that he wrote the grievance on July 2, 2012, put it in an envelope addressed to Connie Green, the grievance coordinator at SCI-Huntingdon, and then put it in the door of his cell to be mailed. (Doc. No. 198, Tr. at 73:8-17.) He further testified that an officer came and picked up the grievance, and that he believed that he had filed the grievance by doing all of the above. (Id., Tr. at 73:18-22.)

 E. Testimony of Rebecca Mitchell

 Plaintiff's counsel next called Rebecca Mitchell to testify. She testified about the Pennsylvania Prison Society, which she described as an organization dedicated to advocating for prisoners, visiting prisoners, writing to prisoners, and listening to prisoners. (Id., Tr. at 74:17-22.) She testified that her role in the Pennsylvania Prison Society is as an official visitor, which means that (1) she visits prisoners when requested to do so by the local arm of the organization, (2) writes letters to those prisoners, and (3) keeps copies of the correspondence between herself and the prisoners. (Id., Tr. at 74:23-75:10.) She testified that she was requested to visit the Plaintiff, Clarence Abney, in late August or early September of 2012. (Id., Tr. at 75:11-76:8.) She testified that she provided a Declaration dated January 4, 2014, (with four letters attached) which constituted her best recollection of the events discussed between her and Plaintiff, which Plaintiff marked as Exhibit I.[12] (Id., Tr. at 76:9-77:2.)

 Plaintiff's Exhibit I is a three page Declaration of Rebecca Mitchell, with four

---

[12] As noted above, Plaintiff's Exhibit I was admitted into evidence by post-hearing stipulation of the parties. (Doc. No. 193 at 1.)

attachments. In her Declaration, Ms. Mitchell attests that the four attachments consist of true copies of four letters that she received from Plaintiff in the fall of 2012. (Doc. No. 188-5 at 1-2.). Attachment A is a letter received shortly after September 30, 2012, Attachment B is a letter received by her shortly after November 30, 2012, Attachment C is a letter received shortly after December 7, 2012, and Attachment D is a letter received shortly after December 13, 2012. (Doc. No. 188-5 at 2.) Her Declaration further provides that the Pennsylvania Prison Society, through Ms. Mitchell, advised Plaintiff to avail himself of the prison grievance procedure in a letter from the Prison Society's Chapter Convenor on or about September 10, 2012, and in a letter from her on or about September 14, 2012. (Id.) Her Declaration also provides that she routinely recommends the DOC grievance process to any prisoner who shares a prison-related problem with her, and if asked, explains the grievance procedure to the best of her ability. (Id. at 3.) Attachment A, the September 30, 2012 letter from Plaintiff to Ms. Mitchell, contains the following question: "did you ever get anything on whether or not if I could send a grievance from this jail over to Huntingdon on the abuse." (Doc. No. 188-5 at 4.) Attachment B, the November 30, 2012 letter, provides: "Also I sent in that grievance we talked about but they rejected that one, but I have another copy from a grievance that I sent and they never responded back to it." (Id. at 6.) Attachment C, the December 7, 2012 letter, contains the following statement regarding grievances: "as for the grievance if you can remember I told you that I sent the grievance and they sent it back rejected saying I didn't send it within the 15 days but I have another grievance that I sent that they never responded back to I have the copy of that as well." (Id. at 9.)

Plaintiff's counsel questioned Ms. Mitchell regarding the number of prisoners she visits,

and the nature and frequency of the correspondence between them. (Doc. No. 198, Tr. at 77:4-21.) Ms. Mitchell testified that prisoners write to her about problems in the prison, both personal and prison-related. (Id., Tr. at 77:13-21.) She testified that if they write to her regarding a prison-related problem, she asks them if they filed a grievance. (Id., Tr. at 77:20-21.) She also testified that she provides prisoners with information about the grievance system that she obtains from the DOC website. (Id., Tr. at 77:22-25.) She testified that Plaintiff asked her about the DOC grievance policy, and that she checked the policy at the time as a result. (Id., Tr. at 78: 1-7.) Upon cross-examination, Mrs. Mitchell stated that in her letter to Plaintiff dated September 14, 2012, she asked him if he had submitted a grievance, so any information that she provided to him about the DC-ADM 804 must have been provided after that date. (Id., Tr. at 79:15-23.)

F.    Additional Evidentiary Issues

While Plaintiff's counsel did not move for the admission of any exhibits at the hearing, as noted above in the margin, by post-hearing stipulation counsel agreed to the admissibility of several of Plaintiff's Exhibits discussed above, specifically, Plaintiff's Exhibits I, Q, S, and T. (Doc. No. 193 at 1.) Defendants' counsel also stipulated that she had no objection to the admission of Plaintiff's Exhibits E, F, J, and U.[13] (Id.) Accordingly, to the extent relevant, the

_____

[13] Exhibit E is the version of DC-ADM 804 that Plaintiff maintains was in effect at the time of the incident. Plaintiff's Exhibit F is DC-ADM 001, the DOC policy governing Inmate Abuse Allegation Monitoring. This exhibit is identical to Defendants' Exhibit 7, admitted into evidence. Plaintiff's Exhibit J consists of two letters from the Office of Special Investigations and Intelligence to Plaintiff, one dated August 22, 2012, and one dated September 17, 2012. The August 22, 2012 letter states as follows: "your allegations of abuse against staff at the State Correctional Institution Huntingdon have been thoroughly investigated. Based on this investigation, further administrative action will be taken. The investigation is now closed." The September 22, 2012 letter responds to a September 6, 2012 letter from Plaintiff and states: "[t]he investigation determined abuse was established and administrative action was taken. Additionally, your confinement at the State Correctional Institution Smithfield is temporary.

Court considers those exhibits in connection with its decision on the issue before it.

Finally, upon the conclusion of testimony, the Court questioned counsel regarding the testimonial reference made to an investigation into the handling of grievances at SCI-Smithfield, and whether or not that investigation was part of the record in this case. (Doc. No. 198, Tr. at 81: 17-82:14.) Defendants' counsel indicated her lack of awareness of any investigation prior to the hearing. (Id., Tr. at 82:12-14.) The Court asked Defendants' counsel to report back to the Court on the details of any such investigation - the time frame in question, whether a written report was produced, and who conducted the investigation. (Id., Tr. at 82:21-25.) The Court stated that if an investigation related to the time frame at issue in this case occurred and resulted in a written report, Defendants' counsel should submit any such report to the Court under seal. (Id., Tr. at 83:1-3.) Defendants' counsel subsequently submitted a letter to the Court indicating that the DOC produced an investigative report regarding the actions of former SCI-Smithfield Superintendent Jon Fisher, which covered events occurring in calendar year 2014. Accordingly, Defendants' counsel indicated her position that, pursuant to the Court's instructions, she was not obligated to provide the report to the Court. (Doc. No. 194.) Subsequently, the Court issued an Order: (1) directing Defendants to file under seal the referenced DOC investigative report, and (2) holding that Plaintiff's deposition transcripts (Plaintiff's Exhibit D) were not admissible as evidence in connection with the Court's decision on the exhaustion of administrative remedies issue. (Doc. No. 196.) Defendants then filed under seal a copy of the investigative report. (Doc. No. 197.)

---

You will be notified shortly of a permanent transfer for a different institution." Exhibit U consists of attachments to an email comprising five different versions of Section 1 of DC-ADM 804.

## V.    DISCUSSION AND FINDINGS

As noted above, the issue before the Court for resolution is whether Defendants have met their burden of proof to establish that Plaintiff failed to exhaust available administrative remedies with regard to Counts 1, 2, and 4 of his complaint.  The primary factual dispute that must be resolved in connection with this issue is whether Plaintiff drafted the grievance dated July 2, 2012, admitted into evidence as Defendants' Exhibit 2 and Plaintiff's Exhibit Q, and mailed it (in the only way available to him) to the grievance coordinator at SCI-Huntingdon on that date, or whether he fabricated the grievance after the fact in light of the rejection of his October 2012 grievance as untimely.  Resolution of this issue is necessary to a determination whether Defendants have met their burden of proof to establish Plaintiff's failure to exhaust available administrative remedies as to Counts 1, 2 and 4.

A secondary factual issue for resolution by the Court is relevant to exhaustion of Counts 2 and 4.  The Court must determine whether Plaintiff's assertion as to his semi-conscious state during and immediately following the assault is supported by the record.  This is so because Chief Magistrate Judge Schwab's previous Report and Recommendation (Doc. No. 95), adopted by the Court, found that, assuming the truth of Plaintiff's representation that he was unconscious or semi-conscious during the assault, it was not practicable for him to identify all Defendants named in Counts 2 and 4 in his July 2, 2012 grievance in order to administratively exhaust his claims against them, under relevant Third Circuit precedent.  Accordingly, if the Court concludes that Plaintiff was in a semi-conscious state immediately following the assault, then, pursuant to the law of the case, the Court should find that Defendants have failed to satisfy their burden of proof to demonstrate failure to exhaust these claims (assuming, of course, that the Court also

finds that Plaintiff filed the July 2, 2012 grievance as he contends). However, because Chief

Magistrate Judge Schwab's Report and Recommendation on this point, adopted by the Court,

based its decision on the language of the DC-ADM 804 that Plaintiff maintains is applicable

because of Defendants' failure to establish which version of the DC-ADM 804 was applicable to

Plaintiff in connection with the relevant motion for partial summary judgment, additional

discussion is necessary.

 At the hearing, both parties offered testimony and submitted evidence regarding which

version of the DC-ADM 804 was in effect and applicable to Plaintiff at the time of the assault,

and appear to seek a factual finding from this Court as to which version was applicable. Chief

Magistrate Judge Schwab in her Report and Recommendation described the relevant difference

between them as follows: "the main difference between them is a provision that is in the

version submitted by the Commonwealth defendants, but not in the version submitted by Abney,

that deals with the specificity with which a prisoner must name the parties involved in the events

that are the subject of the grievance." (Doc. No. 95 at 12 n.3.) Specifically, the version

advocated by Defendants provides, in relevant part, that "[t]he inmate shall identify individuals

directly involved in the event(s)." (Def. Exh. 1 at § 1.A.11.) The version advocated by Plaintiff

provides more generally that "[t]he inmate must include a statement of facts relevant to the

claim." (Pl. Exh. E § 1.A.11.) In their previous partial motions for summary judgment,

Defendants relied on the provision they maintain is applicable in support of their argument that

the July 2, 2012 grievance submitted by Plaintiff (assuming it was filed as he contends) failed to

specifically identify the Defendants against whom he asserts claims in Counts 2 and 4, in

violation of the applicable version of DC-ADM 804, and therefore, he failed to exhaust his

administrative remedies with regard to those claims.

The Court need not resolve this factual issue, however, because it now adopts the conclusion previously reached by Chief Magistrate Schwab in her subsequent Report and Recommendation (albeit in dicta, as she ultimately recommended the denial of Defendants' second motion for partial summary judgment on timeliness grounds), that even accepting that Defendants' version of the DC-ADM 804 was the one applicable to Plaintiff's grievance, Plaintiff's failure to specifically identify the Defendants named in Counts 2 and 4 of his complaint in his July 2, 2012 grievance does not amount to a failure to exhaust the claims asserted in Counts 2 and 4, assuming the truth of Plaintiff's assertion that he was unconscious or only semi-conscious at times during and immediately following the assault.  (Doc. No. 112 at 16-19.)   Accordingly, the Court now turns to resolution of this factual question.

The Court's review of Exhibit S, the video of Plaintiff immediately following the assault, described in more detail above, supports Plaintiff's position that he was in at least a semi-conscious state in the immediate aftermath of the assault.  In light of the Court's adoption of the conclusion previously reached by Chief Magistrate Judge Schwab, this finding means that Defendants have not met their burden of proof to demonstrate Plaintiff's failure to exhaust with regard to Counts 2 and 4;  assuming, of course, that the Court finds in Plaintiff's favor on the ultimate factual question of whether Plaintiff filed a grievance as he maintains on July 2, 2012.

Before discussing that ultimate factual question, the Court first identifies the relevant procedures of the DC-ADM 804 governing an inmate's filing of a grievance in Plaintiff's situation, as Section 1997e(a) requires that a prisoner follow the procedural requirements dictated by the administrative remedy process that is available to him.  See Spruill, 372 F.3d at

231.  On this point, Defendants offered the testimony of Ms. Moore, who explained that the DC-

ADM 804 requirement that a "grievance must be filed with the facility grievance coordinator at

the facility where the grievance event occurred," (Def. Exh. 1 at § 1.A.15),[14] means that in order

to file a grievance at another facility, an inmate must mail the grievance to the facility.  (Doc.

No. 198, Tr. at 12:10-13.)   Defendants, who bear the burden of proof on the exhaustion issue,

did not present any evidence that, in the situation Plaintiff found himself in on July 2, 2012 (in

the POC at SCI-Smithfield), the DC-ADM 804 required him to do anything other than put the

relevant grievance form in an envelope addressed to the grievance coordinator at the facility

where the assault occurred in the opening of his POC door for mailing.[15]  Instead, Defendants

challenge Plaintiff's exhaustion of administrative remedies solely by arguing that Plaintiff lied

---

[14]This same identically-worded provision appears in Defendants' Exhibit 1, the version of
DC-ADM 804 they maintain is applicable to Plaintiff's grievance, and Plaintiff's Exhibit E, the
version of DC-ADM 804 that Plaintiff maintains is applicable to his grievance.  Compare Def.
Exh. 1 at § 1.A.15 with Pl. Exh. E at § 1.A.14.

[15] At the hearing, Plaintiff's counsel elicited testimony from Plaintiff regarding the fact
that he did not have access to a lockbox in the POC, nor could he even see a lockbox from the
POC, and submitted photographs of the POC and rolling lockboxes as Plaintiff's Exhibit T.
Plaintiff's counsel also examined Ms. Moore regarding DC-ADM 804's requirement that each
facility should ensure that a lockbox designated for inmate grievances is installed in all Level 5
housing units. (Doc. No. 198, Tr. at 22:7-23:12.)  In connection with the previous motions for
summary judgment filed in this case, Plaintiff submitted evidence demonstrating that rolling
lockboxes as described in the DC-ADM 804 were not available in the POC at SCI-Smithfield
until later in 2012.  The Court understands Plaintiff's position to be that, in the absence of a
rolling lockbox as prescribed by DC-ADM 804, Plaintiff filed his July 2, 2012 grievance in the
only way available to him - by putting it in the door of his cell and making sure a corrections
officer removed it for mailing.  However, because at the hearing Defendants presented no
evidence challenging Plaintiff's contention that placing a grievance in the opening of the POC
door as Plaintiff contends he did was the appropriate way to file a grievance for an inmate in
Plaintiff's position, instead arguing simply that Plaintiff is lying about placing that grievance in
the opening of the POC door on July 2, 2012, any evidence regarding the lockboxes and whether
they were available to Plaintiff as required by the DC-ADM 804 is not relevant to the issue
before the Court.

about mailing a grievance on July 2, 2012, fabricating the July 2, 2012 grievance after the fact when his October 2012 grievance was denied as untimely. If the Court credits Plaintiff's testimony, then according to the DC-ADM 804, Plaintiff did what was required under the circumstances and provisions of the DC-ADM 804 to file a grievance at SCI-Huntingdon related to the June 29, 2012 assault.

As far as any further action required of Plaintiff by the DC-ADM 804 regarding the July 2, 2012 grievance, Ms. Moore testified that the DC-ADM 804 provides that an inmate is not required to take any further action (i.e., an appeal), regarding a grievance until he receives an Initial Review Response on the grievance. (Id., Tr. at 17:5-8; Def. Exh. 1 at §2.A.1.b; Pl. Exh. E at § 2.A.1.b.) If Plaintiff never received an Initial Review Response to his July 2, 2012 grievance, as he contends, under the DC-ADM 804, he has no further available administrative remedies to pursue with regard to that grievance. Accordingly, the Court's resolution of the factual dispute as to whether Plaintiff in fact placed the grievance in his POC door on July 2, 2012 or more precisely, whether Defendants have met their burden to demonstrate the Plaintiff did not place the grievance in his POC door on July 2, 2012, is determinative of the exhaustion issue.

As to that ultimate factual question, Plaintiff testified under oath upon questioning by Defendants' counsel and his own counsel that he filled out a grievance form at SCI-Smithfield on July 2, 2012, and placed it in the opening of his POC door for mailing to Connie Green, the grievance coordinator at SCI-Huntingdon. In an attempt to discredit Plaintiff's testimony, Defendants presented the following evidence: (1) testimony of Connie Green, grievance coordinator at SCI-Huntingdon, to the effect that she received no July 2, 2012 grievance from

Plaintiff, and that she has never ignored or destroyed any grievance, nor did she know anyone who did so at SCI-Huntingdon; (2) testimony from Plaintiff and Rebecca Mitchell regarding their correspondence about the grievance process contemplated by DC-ADM 804, and specifically, Plaintiff's question to her in a September 30, 2012 letter asking "did you ever get anything on whether or not if I could send a grievance from this jail over to Huntingdon on the abuse;" and (3) Plaintiff's October 12, 2012 grievance and its explanation of the reason for its tardiness as "because I was moved and I didn't know that I could send the grievance back to SCI-Huntingdon," (Def. Exh. 3 at 2). Defendants argue that this evidence demonstrates that Plaintiff never mailed a grievance on July 2, 2012, and instead fabricated it after his October 12, 2012 grievance was rejected as untimely.

Plaintiff's position, as evidenced by the testimony offered at the hearing, is that given the fact that he did not receive a response to the July 2, 2012 grievance, he was unsure whether the SCI-Huntingdon grievance coordinator received the grievance, and therefore, his question to Ms. Mitchell was prompted by the lack of response to his grievance. Further, Plaintiff's counsel's questioning of Connie Green regarding a DOC investigation into the mishandling of grievances at SCI-Smithfield was clearly intended to raise the possibility that Plaintiff's grievance did not get to the shared mailroom of SCI-Smithfield and SCI-Huntingdon (and its ultimate destination at SCI-Huntingdon) because of some mishandling of the grievance on the part of personnel at SCI-Smithfield.

However, in the Court's view, if it finds Plaintiff's testimony to be credible, the Court need not speculate about precisely what happened to Plaintiff's July 2, 2012 grievance between its removal from Plaintiff's POC door at SCI-Smithfield and its failure to arrive in Connie

Green's office at SCI-Huntingdon in order to find that Plaintiff utilized the administrative remedy available to him, and that further pursuit of the administrative process was not available to him in the absence of a response to the grievance.[16] Ultimately, the Court finds that the evidence presented by Defendants fails to discredit Plaintiff's sworn testimony, offered multiple times at the hearing, that he filled out a grievance form on July 2, 2012, put it in an envelope addressed to Connie Green, the grievance coordinator at SCI-Huntingdon, placed it in the opening of the door of his cell, and saw a corrections officer remove it for mailing. As to the explanation for tardiness included on Plaintiff's October 12, 2012 grievance, relied on by Defendants in support of their argument that Plaintiff did not know before that date that he could submit a grievance to SCI-Huntingdon from SCI-Smithfield, and accordingly, did not submit the July 2, 2012 grievance as he describes, the Court finds that the explanation contained in the October 12, 2012 grievance, and Plaintiff's questions to Ms. Mitchell on the subject are also consistent with Plaintiff's stated confusion about whether he could file a grievance in that manner given the lack of response to the July 2, 2012 grievance, as he maintains. Accordingly, the Court finds that Defendants have not met their burden to show that Plaintiff failed to exhaust available administrative remedies under DC-ADM 804.[17] Based on the foregoing, the Court

---

[16] For that reason, the Court declines to discuss the sealed DOC investigative report regarding former SCI-Smithfield Superintendent Jon Fisher, beyond noting that the report specifically pertains to events that occurred in calendar year 2014, and that Superintendent Fisher became Superintendent at SCI-Smithfield at some point in 2009.

[17] Plaintiff also maintains that he exhausted administrative remedies through the DC-ADM 001, pertaining to the reporting of inmate abuse. Because the Court concludes that Defendants have not met their burden of proof to show that Plaintiff failed to exhaust administrative remedies under DC-ADM 804, the Court need not consider whether Plaintiff exhausted administrative remedies through DC-ADM 001.

makes the following findings of fact and conclusions of law.

## A. Findings of Fact

1. Plaintiff was in a semi-conscious state during the period of time immediately following the June 29, 2012 assault.

2. Pursuant to the DC-ADM 804, the provision that a "grievance must be filed with the facility grievance coordinator at the facility where the grievance event occurred" means that, in order to file a grievance at another facility, an inmate must mail the grievance to that facility.

3. For an inmate in a POC at SCI-Smithfield on July 2, 2012, in the absence of a rolling lockbox for the submission of grievances, mailing a grievance meant putting the grievance, addressed to the grievance coordinator at the facility where the incident that is the subject of the grievance took place, in the opening in the door of his cell for retrieval by a corrections officer for mailing.

4. Defendants failed to meet their burden of proof to demonstrate that Plaintiff did not mail the July 2, 2012 grievance as he testified.

## B. Conclusions of Law

1. In light of Plaintiff's physical state in the immediate aftermath of the June 29, 2012 assault, Plaintiff included as many details as it was practicable for him to know in his July 2, 2012 grievance, and his failure to identify all individuals involved in the assault in his grievance resulted from a "justifiable excuse." See Williams v. Pa. Dep't of Corr., 146 F. App'x 554, 557 (3d Cir. 2005).

2. Plaintiff had no further remedy available to him under the DC-ADM 804 after he received no response to the grievance that he submitted on July 2, 2012. Small v. Camden Cnty., 728 F.3d 265, 273 (3d Cir. 2013); DC-ADM 804 § 2.A.1.b (permitting appeal only after response to grievance).

3. Defendants have not met their burden of demonstrating that Plaintiff failed to exhaust available administrative remedies as to Counts 1, 2, and 4 of his complaint.

## VI. CONCLUSION

For the foregoing reasons, the Court finds that Defendants have not met their burden of demonstrating that Plaintiff failed to exhaust available administrative remedies with regard to

Counts 1, 2, and 4 of his complaint. This matter will be recommitted to Magistrate Judge Carlson for further pretrial management, including the establishment of case management deadlines relative to discovery on the merits of Plaintiff's claims. An appropriate Order accompanies this Memorandum.